UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TRUSTEES OF THE LCOAL 7 TILE INDUSTRY WELFARE FUND, THE LOCAL 7 TILE INDUSTRY ANNUITY FUND, and THE TILE LAYERS LOCAL UNION 52 PENSION FUND, TRUSTEES OF THE BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENION FUND, and TRUSTEES OF THE INTERNAIONAL MASONRY INSTITUTE, TRUSTEES OF THE MARBLE INDUSTRY PENSION FUND, THE MARBLE INDUSTRY ANNUITY FUND, and THE MARBLE INDUSTRY TRUST FUND,

       Plaintiffs,

  -against-

CASTLE STONE AND TILE,INC., and CATHEDRAL STONE & TILE CO., INC,

       Defendants.

**MEMORANDUM & ORDER**

**17-CV-3187 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Trustees of the Local 7 Tile Industry Welfare Fund, the Local 7 Tile Industry Annuity Fund, the Tile Layers Local Union 52 Pension Fund, Trustees of the Bricklayers & Trowel Trades International Pension Fund, Trustees of the International Masonry Institute, Trustees of the Marble Industry Pension Fund, the Marble Industry Annuity Fund, and the Marble Industry Trust Fund (collectively the "Funds") bring this action against Defendants Castle Stone and Tile, Inc. ("Castle") and Cathedral Stone & Tile Co., Inc. ("Cathedral"). Plaintiffs assert claims under §§ 502(a)(3) and 515 of the Employee Retirement Income Security Act, as amended, 29 U.S.C. §§ 1132(a)(3), 1145 ("ERISA"), and § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. (*See* Compl. (Dkt. 1).) Plaintiffs allege that Castle failed to

1

make contributions to the Funds as mandated by a collective bargaining agreement ("CBA") it signed with the pertinent unions and that Cathedral is liable for Castle's delinquency because the two Defendants are a single employer or alter egos under ERISA. (*See generally* Compl.)

Pending before the court is Defendants' motion for summary judgment. (*See* Mot. for Summ. J. (Dkt. 23); Mem. in Supp. of Mot. for Summ. J. ("Mem") (Dkt. 23-2); Mem. in Opp. to Mot. for Summ. J. ("Opp.") (Dkt. 24); Reply (Dkt. 25).) For the reasons explained below, Defendants' motion is DENIED.

I.  **BACKGROUND**

The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence submitted. The following facts are undisputed except where otherwise noted. Where the parties allege different facts, the court notes the dispute and credits Plaintiffs' version if it is supported by evidence in the record. All evidence is construed in the light most favorable to Plaintiffs, as the non-moving parties, with all "reasonable inferences" drawn in their favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).[1]

Sharon Amari and Edward Teran are friends and have known each other for over 20 years. (Tr. of Apr. 2, 2018 Dep. of Sharon Amari ("Amari Tr.") (Dkt. 24-4) at 139:20-140:17.) Teran is the current owner of Cathedral, a company that supplies and installs stone and tile. (Defs. R. 56.1 Statement ("Defs. 56.1") (Dkt. 23-1) ¶¶ 1, 3.) Its office is located at 16 Filmore Place, Freeport, NY. (*Id.* ¶ 6.) It also has a warehouse at this location that it uses to store equipment and materials; Cathedral shares its warehouse

---

[1] When quoting cases and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

space with other companies. (*Id.* ¶ 7.) Defendants claim that Teran is the sole officer of Cathedral, but Amari has claimed to be the Vice President of the company in her LinkedIn profile and in her email signature. (*Id.* ¶ 2; Amari Tr. 62:21-63:8, 168:13-21.) Teran believes that "[u]nion guys are lazy" and that working with union labor is "a lot more expensive." (Tr. of Mar. 29, 2018 Dep. of Edward Teran ("Teran Tr.") (Dkt. 24-5) at 57:9-10.)

Amari is the sole officer and director of Castle. (Defs. 56.1 ¶ 30.) She founded Castle in July 2014 after speaking with Teran about her plans to do so. (Amari Tr. at 26:14-20, 165:16-18.) Castle is a company that installs stone, tile, porcelain and ceramic. (Defs. 56.1 ¶ 36.) Castle signed a CBA with the unions in 2015. (*Id.* ¶ 60.) Amari testified that Castle's office is in her personal residence in East Northport, NY, consisting of "half of a garage and a den that was converted to an office space." (*Id.* ¶¶ 32-33; Amari Tr. at 54:24-25.) Plaintiffs claim this office is little more than a façade, pointing out that (1) Castle does not pay rent or utilities at this location, (2) Amari has no fixed hours of work at this office (and works in Cathedral's office during normal business hours), (3) Amari listed Cathedral's phone number on the CBA that she signed on Castle's behalf, and (4) Cathedral receives calls for Castle at Cathedral's office. (Pls. Rule 56.1 Statement ("Pls. 56.1) (Dkt. 24-1) ¶¶ 32-34; Amari Tr. at 54:5-55:21, 58:6-21, 141:15-142:11; Teran Tr. at 141:14-25.) Additionally, Amari conducts Castle business at Cathedral's office. (Amari Tr. at 69:24-25 (testifying that she would agree to subcontract terms on behalf of Castle while working in Cathedral's office), 72:24-25 (Amari left Castle invoices for payment by Cathedral on Teran's desk).) Amari is able to conduct Castle's business from Cathedral's office because she works for Cathedral in addition to owning Castle. While Castle has never paid Amari a salary, she earns $120,000 per year from Cathedral. (Amari Tr. at 25:21, 32:21-24.) She started at Cathedral in sales in 2007 or 2008 and by 2013 served

3

as Cathedral's bookkeeper "and oversaw accounts payable, accounts receivable[,] and payroll." (Defs. 56.1 ¶¶ 63, 65.)

Defendants assert there is a clear distinction between the work done by each company: Cathedral does only non-union work and Castle does only union work. (*See* Defs. 56.1 ¶¶ 17, 26, 43.) Plaintiffs agree that Amari formed Castle to perform union work (*see* Pls. 56.1 ¶ 43), but dispute the remainder of this narrative. Cathedral, through Teran, bids on both union and non-union projects. (Teran Tr. at 54:21-24.) In a hearing before the NLRB on an unrelated matter, Teran testified that although he "is a non-union company," he occasionally "get[s] a union project . . . and [the union] stops [him] from working." (Tr. of Jan. 28, 2016 NLRB Hearing for Case No. 29-CB-58878 (Dkt. 24-2) at 68:1-3; *see also id.* at 66:9-19 (describing the union preventing Cathedral from using non-union labor for a union project).)

Castle and Cathedral share employees, supervisors, and equipment. In addition to Amari, Romano Payonne, Jefferson Sanchez, and Louis Guachichulca worked for both Cathedral and Castle. (Teran Tr. at 98:6-14.) Additionally, both Teran and Amari testified that Teran and John Snow (another Cathedral supervisor) would supervise Castle's work. (*See* Amari Tr. at 143:14-22; Teran Tr. at 60:16-19.) Castle owns no equipment and, Cathedral supplies—apparently free of charge—all necessary equipment and materials for Castle's projects.[2] (Amari Tr. at 74:13-22, 85:5-6; Teran Tr. at 109:14-19.)

Transactions between Cathedral and Castle were irregular. Amari made oral bids to Teran for Cathedral projects, and Teran orally selected Castle's bids. (Teran Tr. at 67:4-6; Amari Tr. at 69:16-21, 71:7-19.) After Castle completed work on a particular

---

[2] Defendants assert that the Castle factored use of Cathedral's equipment into the subcontract price. (*See* Defs. 56.1 ¶ 56.) This does not square with Amari's testimony that her bids to Teran were based on "labor only." (Amari Tr. at 92:6-7.)

project, "Cathedral paid what they could pay when they could pay it." (Amari Tr. at 123:21-22; *see also* Teran Tr. at 83:2-25 (testifying that he made payments on Castle's invoices based on "how much [he] can afford"). Also, Amari was given authority to sign checks on behalf of Cathedral shortly before founding Castle. (Defs. 56.1 ¶ 67; Amari Tr. 164:2-7.) On multiple occasions, Amari has signed checks from Cathedral to Castle, placing her on both sides those transactions. (Amari Tr. at 126:14-127:10, 128:7:16, 134:15-23.)

Castle's financial documents suggest further irregularities. Castle's bank account was opened in August 19, 2014 with a $1,000 deposit from Cathedral. (*See* Castle August 2014 Bank Statement (Dkt. 24-8); Castle General Ledger (Dkt. 24-7) at ECF 2.) In the three years between Castle's founding and the commencement of this action, Castle only ever performed subcontracting work for Cathedral. (*Id.* at 34:16-21.) Indeed, Cathedral was Castle's sole source of revenue for that period. (*See generally* Castle General Ledger.) Cathedral would deposit money into Castle's account whenever Castle's balance veered close zero or became negative. (*See Id.*)

Finally, the allegations on which this action is based are derived by an audit conducted by the Funds, which estimated Castle's delinquent contributions to the Funds based on the money paid by Cathedral to Castle. (Defs. 56.1 ¶¶ 82-83.)

## II.  LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v.*

*Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (alteration adopted).

"To determine whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" *Mikhaylov v. Y & B Trans. Co.*, No. 15-CV-7109 (DLI), 2019 WL 1492907, at *3 (E.D.N.Y. Mar. 31, 2019) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995)). While the court must draw all inferences in favor of the non-movant, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).

### III. DISCUSSION

#### A. Cathedral's Liability for Castle's Obligations Under the CBA

The Funds do not allege that Cathedral is party to a CBA; instead they assert that Cathedral is liable for Castle's obligations under its CBA because the two entities are a single employer and because they are alter egos. (*See* Compl.)

While the single employer and alter ego doctrines are "conceptually distinct," *Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. Canal Escorts, Inc.*, No. 14-CV-4575 (SMG), 2020 WL 1472439, at *7 (E.D.N.Y. Mar. 26, 2020), "[t]he determinations of both single employer and alter ego status are

6

questions of fact." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (per curiam). "Accordingly, summary judgment is appropriate only if no reasonable juror could conclude, on the facts available at summary judgment, that defendants either did or did not constitute a single employer or alter egos." *Trs. of Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund v. K.A.N. Elevator Inc.*, No. 16-CV-7408 (PAE), 2018 WL 2727884, at *6 (S.D.N.Y. June 5, 2018); *see also Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp.*, No. 13-CV-4363 (SJF), 2015 WL 790085, at *8 (E.D.N.Y. Feb. 24, 2015) (denying summary judgment on single employer theory where "the evidence [was] not so one-sided as to preclude a reasonable factfinder from holding in favor of either party on this issue").

    1. Single Employer Analysis

"A CBA that binds one entity also binds a non-signatory entity if (1) the two entities are a single employer and (2) the employees of the entities constitute a single appropriate bargaining unit." *Div. 1181 A.T.U.-New York Emps. Pension Fund By Cordiello v. City of New York Dep't of Educ.*, 910 F.3d 608, 617 (2d Cir. 2018). Courts consider several non-dispositive factors in determining whether two entities are a single employer: "interrelation of operations, common management, centralized control of labor relations[,] and common ownership." *Lihli Fashions*, 80 F.3d at 747; *see also Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965). The Second Circuit has found that "two additional factors: (5) the use of common office facilities and equipment, and (6) family connections between or among the various enterprises" are also relevant. *United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17, 19 (2d Cir. 2013). "To demonstrate single employer status,

7

not every factor need be present, and no particular factor is controlling." *Lihli Fashions*, 80 F.3d at 747. Single employer status "depends on all the circumstances of the case" and is "[u]ltimately . . . characterized by [the] absence of an arms[-]length relationship" between the entities. *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001).

The first factor, interrelation of operations, weighs heavily in favor of Defendants being a single employer. Courts considering this factor often look at whether the entities share assets, offices, and telephone numbers. *Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 341 (E.D.N.Y. 2017). Also relevant is whether "companies made payments to one another and made payments on behalf of one another." *Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 350 (N.D.N.Y. 2000). Here, while Castle has a nominal office in Amari's residence, Amari works at Cathedral during normal business hours. She conducts Castle's business at Cathedral's office and listed Cathedral's phone number on Castle's CBA. By way of her employment with Cathedral, Amari—as the putative head of a subcontractor—is aware of Cathedral's profit margins, expenses, and processes for estimating and bidding on jobs. Cathedral is Castle's sole source of revenue and Cathedral provides supplies and equipment for Castle to complete its jobs. Finally, Amari the Cathedral employee has signed checks paying Amari the owner of Castle, including a check for $1,000 used to open Castle's bank account before Castle completed any work for Cathedral.[3]

---

[3] In their brief, Defendants argue against interrelation of operations based on factors most commonly considered in employment discrimination claims brought under Title VII. (*See* Mem. at 17 (citing *United Union of*

8

The court considers the common management and common ownership factors in tandem; the analyses tend to overlap and these two factors are generally "accorded less weight." *K.A.N. Elevator Inc.*, 2018 WL 2727884, at *6. First, the evidence around common management favors a finding that Defendants are a single employer. Courts find common management between two entities when employees hold management responsibilities at both entities and when the entities share employees. *Mauro's Plumbing,* 84 F. Supp. 2d at 349-50. Defendants assert that Teran is the sole owner and officer of Cathedral and that Amari is the sole owner and officer of Castle. However, the evidence demonstrates that, at least, Amari held herself out as Cathedral's vice president to Cathedral's customers and clients via her email signature as well as to the public at large via her LinkedIn profile. Additionally, Teran and John Snow supervised projects for both Cathedral and Castle and several other employees worked for both companies.[4] The evidence of common ownership is more muddled. Cathedral and Castle are nominally owned by different people, with no overlap of legal ownership. And while there is some evidence of Amari and Teran being "connected by close bonds of history or affection," *K.A.N. Elevator Inc.*, 2018 WL 2727884, at *8, they are not family. Still, the evidence for both of these factors weighs in favor of finding that Defendants are a single employer.

---

*Roofers, Waterproofers, Allied Workers, Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, No. 07-CV-224 (HKS), 2012 WL 4092598, at *10 (W.D.N.Y. Sept. 10, 2012).) This line of cases is not particularly relevant to the issue at hand.

[4] Defendants' argument on this point is flatly contradicted by the evidence they cite for support. Defendants cite Amari's deposition testimony for the proposition that Castle's work is not supervised by "Teran or anyone from Cathedral." (Mem. at 19.) In fact, at that point in her deposition, Amari testified that "occasionally, either John Snow from Cathedral or Eddie Teran from Cathedral" would supervise Castle projects. (Amari Tr. at 143:16-18.)

9

The centralized control of labor relations is typically important, but carries limited weight here. This is because "it is inappropriate" to "accord[] centralized control of labor relations substantial importance . . . where one of the companies has no employees." *Carnival Carting, Inc. v. N.L.R.B.*, 455 F. App'x 20, 23 (2d Cir. 2012) (summary order). Here, it is undisputed that Amari, as the owner of the company, had no permanent employees. At the same time, Amari was also an employee of Cathedral and was responsible for writing at least some of the checks that were used to pay Castle's temporary employees. This factor also weighs in Plaintiffs' favor.

The next factor is the use of common office facilities and equipment. This weighs in favor of finding Defendants are a single employer. As mentioned above, Amari listed Cathedral's phone number on Castle's CBA and Teran conceded to receiving calls for Castle on Cathedral's office phone. Additionally, the parties do not dispute that Castle used Cathedral's equipment and supplies when completing jobs for Cathedral.

The last factor looks at whether there are family connections between the entities. This factor does not weigh as strongly in Plaintiff's favor as the other factors, but also does not counsel against a finding that Defendants are a single employer. Although Amari and Teran are not related, they are friends who have known and worked with each other for decades. Courts have found that close personal relationships between the principles of purportedly separate entities can indicate the lack of arms-length negotiations between the entities. *See High Performance Floors, Inc.*, 233 F. Supp. 3d at 346 ("[A] friendship lasting more than 30 years" supports the proposition that the "entities did not function at arm's length.").

Additionally, the unorthodox manner in which Castle bids on, is awarded, and is paid for Cathedral projects suggests a closer-than-arms-length relationship between the two entities. Amari

makes oral bids to Teran, who in turn orally grants the project to Castle. When the work is completed, Teran "pays what he can," when he can, and Amari does not object to Castle being paid for the work it completes based on the whims and fortunes of Teran. Further, Teran's whims and fortunes tend to provide Castle with just enough revenue to avoid maintaining a negative balance on its bank account, although not enough to allow Amari to draw a salary or any other renumeration as Castle's owner. This arrangement is unlike any arms-length transaction of which the court is aware, and strongly supports Plaintiffs' contention that Castle and Cathedral are a single employer.

Considering the admissible evidence submitted by the parties and drawing reasonable inferences in favor of the Plaintiffs as the non-moving parties, there are substantial disputes of material fact that prevent the court from finding as a matter of law that Castle and Cathedral are not a single employer.

### 2. Single Bargaining Unit

Even if a court finds two entities to be a single employer, a CBA signed by one entity is not binding on the non-signatory unless they also "represent an appropriate employee bargaining unit." *Ferrara v. Happy Time Trucking, LLC*, 436 F. Supp. 3d 606, 617 (E.D.N.Y. 2020). At this point in the analysis, "attention shifts from the control, structure and ownership of the employer to the community of interests of the employees." *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 264 (E.D.N.Y. 2012). To determine whether a community of interests exists, courts consider "factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange." *Brown*, 250 F.3d at 129 n.2. A community of interests exists where "contributions sought are for the same job classification . . . and for the same type of work." *Bourgal v. Robco Contracting Enters., Ltd.*, 969 F. Supp. 854, 863 (E.D.N.Y. 1997), *aff'd*, 182 F.3d 898 (2d Cir.

1999). Courts in this circuit have also found a community of interests based on an overlap of employees who perform "similar, if not identical" work, *High Performance Floors, Inc.*, 233 F. Supp. 3d at 346, or a combination of "operational integration, geographical proximity, and employee interchange," *Oakfield Leasing* 904 F. Supp. 2d at 264.

Plaintiffs have amply demonstrated that there is, at the very least, a question of material fact as to whether Cathedral and Castle represent a single bargaining unit. The two entities perform similar, if not identical, work in the same geographic region. Also, several individuals work for both companies. Finally, Teran and John Snow supervise project work for both companies. Because Plaintiffs have provided evidence tending to show a "community of interests of the employees" of Castle and Cathedral, the court cannot find as a matter of law that the companies do not represent a single bargaining unit.

### 3. Alter Ego Analysis

The alter ego theory of liability "provides an[other] analytical hook to bind a non-signatory to a collective bargaining agreement." *Local Union No. 38, Sheet Metal Worker' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004) (per curiam). The alter ego analysis "is flexible, allowing courts to weigh the circumstances of the individual case." *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010). Often important to the analysis is "whether two enterprises have substantially identical management, business purposes, operations, equipment, customers, supervision, and ownership." *Cordiello*, 910 F.3d at 618. "[A]n anti-union animus or an intent to evade union obligations" is "germane" and "perhaps . . . [a] sufficient basis for imposing alter ego status," but it is not a "necessary factor." *UNITE HERE*, 629 F.3d at 288. The alter ego test ultimately seeks to uncover any

"attempt to avoid the obligations of a CBA through a sham transaction or technical change in operations." *Cordiello*, 910 F.3d at 618.

Although the single employer and alter ego inquiries "generally warrant separate analysis," *Bourgal*, 969 F. Supp. at 863, several of the single employer factors are also relevant to the alter ego inquiry. The court discussed above how the available evidence creates questions of material fact about whether the two companies shared ownership and management as well as operations, equipment, and supervision. Remaining to discuss is whether Castle and Cathedral shared a common business purpose or customers and whether there is evidence of anti-union bias.

All three of these factors point toward a finding that Castle and Cathedral are alter egos. First, the companies share a common business purpose;[5] they both perform tile and stone installation work in the same geographic area. Next the evidence shows that Castle and Cathedral also share customers. Teran has testified, in effect, that he bids on union and nonunion projects and, when the union shuts down his use of non-union labor on a union project, he engages a union subcontracter like Castle to finish the job. This process necessarily involves the companies sharing common customers. Finally, Teran's testimony also reveals anti-union sentiment. He testified that "[u]nion guys are lazy," and that working with union labor "is just a lot more expensive." (Teran Tr. at 57:9-10.)

---

[5] Common business purpose exists when companies perform the same type of work in similar geographic areas. *See Mauro's Plumbing*, 84 F. Supp. 2d at 350. Minor differences, including whether a company performs union or non-union work, will not defeat a finding that two companies share a common business purpose. *High Performance Floors*, 233 F. Supp. 3d at 338. Notably, Defendants do not contest that they share a common business purpose. (*See* Mem. at 11-16.)

The totality of the evidence raises a question of material fact as to whether Castle was created to allow Cathedral to "avoid the obligations of a CBA." *Cordiello*, 910 F.3d at 618. Teran uses non-union labor for union projects until he is shut down, at which point he engages Castle—a company kept barely in the black by timely deposits from Cathedral, its sole source of revenue—to finish the project. Based on the available evidence, a reasonable factfinder might view these actions as Teran's attempt to avoid obligations under a CBA.

In sum, there is at least a question of material fact as to whether the Defendants are alter egos, and, as such, Defendants are not entitled to summary judgment on this issue.

### B.  The Alleged Inaccuracy of Castle's Contributions

Defendants next assert they are entitled to summary judgment because the damages Plaintiffs seek are based on estimates derived from a "fundamentally flawed" audit. (*See* Mem. at 24-25.) Plaintiffs do not dispute that their claim for damages is estimated, but argue that Defendants' failure to keep records as required by the CBA shifts the burden of proof on this issue to Defendants.[6] (*See* Opp. at 22-25.)

---

[6] Plaintiffs rely on a burden-shifting rule stemming from *Combs v. King,* an Eleventh Circuit case from the mid-eighties. 764 F.2d 818 (11th Cir. 1985). Under this rule, if a plaintiff shows "(a) improper record-keeping by the defendants, (b) that employees performed work for which they were improperly compensated, and (c) the amount and extent of that work as a matter of just and reasonable inference . . . , the onus shifts to the employer-defendant to disprove damages." *Reilly v. Reem Contracting Corp.*, 380 F. App'x 16, 20 (2d Cir. 2010). The Second Circuit has not formally adopted this analysis. *See id.* ("We have not addressed whether the *Combs* burden-shifting rule . . . applies in ERISA cases where an employer has not maintained records sufficient to determine whether a CBA covers a given employee's work at a particular time."). It has, however, described the *Combs* rule as a potential "remed[y] . . . appropriately tailored to preventing false reporting," *La Barbera v. J.D. Collyer Equip. Corp.*, 337 F.3d

14

Defendants' argument—premised on the belief that "Plaintiffs have the burden of proof to establish the inaccuracy of a defendant employer's contributions" (Mem. at 24)—is misguided. Regardless of what Plaintiffs' trial burden may be, it is Defendants' burden at summary judgment to demonstrate an absence of any question of material fact as to whether Castle failed to make contributions to the Funds as required by the CBA. The Funds' audit is sufficient to defeat summary judgement, and further "inquiries into the reasonableness of the Funds' audit or the adequacy of [D]efendants' employee records are properly left for trial." *Morin v. Spectrum Contracting Grp., Inc.*, No. 08-CV-3567 (SJF) (AKT), 2011 WL 1323005, at *3 (E.D.N.Y. Jan. 13, 2011), *report and recommendation adopted,* No. 08-CV-3567 (SJF), 2011 WL 1253232 (E.D.N.Y. Mar. 28, 2011).

### IV. CONCLUSION

For the reasons explained above, Defendants' (Dkt. 23) motion for summary judgment is DENIED.

SO ORDERED.

Dated:   Brooklyn, New York
         August 4, 2020

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge

---

132, 139 & n.3 (2d Cir. 2003), and cited to it with approval, *see Jacobson v. Empire Elec. Contractors, Inc.*, 339 F. App'x 51, 53 (2d Cir. 2009). However, it would be premature to apply this rule at summary judgment. *See, e.g., Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 347 (E.D.N.Y. 2009) ("[W]hile lower courts have applied the burden shifting analysis at trial, they have declined to do so at the summary judgment stage.").