UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUSTEES OF THE LOCAL 7 TILE INDUSTRY WELFARE FUND, THE LOCAL 7 TILE INDUSTRY ANNUITY FUND, and THE TILE LAYERS LOCAL UNION 52 PENSION FUND, TRUSTEES OF THE BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND, and TRUSTEES OF THE INTERNATIONAL MASONRY INSTITUTE, TRUSTEES OF THE MARBLE INDUSTRY PENSION FUND, THE MARBLE INDUSTRY ANNUITY FUND, and THE MARBLE INDUSTRY TRUST FUND, | **MEMORANDUM & ORDER 17-CV-3187 (NGG) (RER)** |

Plaintiffs,

-against-

CASTLE STONE AND TILE, INC. and
CATHEDRAL STONE & TILE CO., INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, trustees for various labor-management funds,[1] bring this action against Defendants Castle Stone and Tile, Inc. and Cathedral Stone & Tile Co., Inc., asserting claims under Sections

---

[1] Plaintiffs are Trustees of the Local 7 Tile Industry Welfare Fund, the Local 7 Tile Industry Annuity Fund, and the Tile Layers Local Union 52 Pension Fund; Trustees of the Bricklayers & Trowel Trades International Pension Fund; Trustees of the International Masonry Institute; and Trustees of the Marble Industry Pension Fund, the Marble Industry Annuity Fund, and the Marble Industry Trust Fund.

502(a)(3) and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1145, and Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. (*See* Am. Compl. (Dkt. 39).) They make three claims: (1) Castle failed to make contributions to the Funds as mandated by the relevant collective bargaining agreements ("CBAs") it signed with the unions; (2) Defendants are jointly and severally liable for Castle's delinquency because they constitute a single employer and alter egos of one another; and (3) as a result of their single employer/alter ego status, Cathedral is bound to the CBAs and similarly maintains a delinquency, for which Defendants are also jointly and severally liable.

The court previously denied Defendants' motion for summary judgment. (Aug. 4, 2020 M&O (Dkt. 29).) As the parties proceeded to trial, though, Cathedral's counsel withdrew from the case, citing Cathedral's failure to pay legal fees and a breakdown of communications. (Decl. in Supp. of Mot. to Withdraw from Cathedral (Dkt. 45); Jan. 7, 2021 Order (Dkt. 48).) Three months later, Castle's counsel moved to withdraw because Castle, through its President, Sharon Amari, terminated them. (Mot. to Withdraw from Castle (Dkt. 54).) But Castle's counsel withdrew that motion soon thereafter. (*See* May 13, 2021 Not. (Dkt. 57).) Because Cathedral failed to subsequently appear through counsel, the Clerk of Court entered an entry of default against Cathedral. (*See* Entry of Default (Dkt. 55).) Plaintiffs later moved for default judgment against Cathedral, (Mot. for Default J. (Dkt. 59)), which the court granted, (Mar. 31, 2022 Order (Dkt. 72)).

A bench trial was held on July 13, 2021. After considering the evidence at trial, and having reviewed the parties' post-trial submissions, the court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a):

- Castle is delinquent in its contributions to the Plaintiff Funds.

- Castle and Cathedral constitute a single employer and single employee bargaining unit.

- Castle and Cathedral are alter egos of one another.

- Because of Defendants' single employer/alter ego status, Cathedral is bound to the Castle-signed CBAs.

- Because Cathedral is bound to the CBAs, Cathedral is obligated to remit contributions to Plaintiffs for each hour of Cathedral employees' "Covered Work" pursuant to the CBAs.

- Finally, because of their single employer/alter ego status, Defendants are jointly and severally liable for Castle's and Cathedral's delinquent contributions, plus accompanying damages provided under the CBAs, enforceable through Section 301 of the LMRA, 29 U.S.C. § 185, and Sections 502(g)(2) and 515 of ERISA, 29 U.S.C. §§ 1132(g)(2), 1145.

As to the damages jointly and severally owed by Defendants for their respective delinquencies, the court finds that Plaintiffs must recalculate those damages in accordance with this decision. Therefore, the court RESERVES judgment on awarding Plaintiffs' damages,  attorneys' fees and costs, and auditor costs until it has reviewed Plaintiffs' resubmission.

## I.   SINGLE EMPLOYER AND ALTER EGO

### A.   Findings of Fact

These findings of fact are based on the joint stipulations of fact, (*see* Third Am. Joint Pre-Trial Order ("JPTO") (Dkt. 66)), and the testimony and exhibits adduced during the bench trial, (*see* July 13, 2021, Tr. of Proceedings ("Tr.") (Dkt. 69)).

#### 1.   Cathedral Stone & Tile Co., Inc.

Operating out of an office at 16 Filmore Place in Freeport, New York, Ed Teran runs Cathedral Stone & Tile, a company that supplies and installs stone and tile. (*See* JPTO at 5.) Cathedral is a non-union company. But Teran, through Cathedral, bids on both union and non-union jobs. (Tr. at 54:3-6, 138:25-139:7.) When Cathedral wins a union job, it awards that contract to a union subcontractor to perform the work. (*Id*. at 88:7-89:6, 123:19-124:2, 138:25-139:7.)

Teran, as Cathedral's sole owner, determines when and how much to bid for a project. (*See* JPTO at 5; *see, e.g.*, Tr. at 113:2-16, 117:17-118:7.) He also supervises the work on Cathedral's projects. (*See* Tr. at 19:4-9.) But his friend of over twenty years, Sharon Amari, manages Cathedral's operations and office responsibilities. (*See* JPTO at 5-6.)

Teran hired Amari in 2007 as a salesperson to market Cathedral services to general contractors. (*See* Tr. at 101:4-22.) By 2013, her duties expanded to purchasing materials for construction projects, obtaining insurance quotes, and serving as bookkeeper, which included managing payroll, accounts payable, and accounts receivable. (*See id*. at 101:8-102:9, 104:6-15.) By 2014, she became a signatory on Cathedral's Chase bank account, authorizing her to issue and sign checks on behalf of Cathedral. (*Id*. at 124:3-23.) She also served as Cathedral's point of contact for some general contractors after Cathedral won a project. (*See, e.g.*,

Pls.' Exs. 19-21.) Over time, Amari represented herself in customer emails and on LinkedIn as Cathedral's Vice President. (Tr. at 108:11-109:10, 122:11-123:7; *e.g.*, Pls.' Ex. 15-1.) She contends that she promoted herself to earn respect in a male-dominated industry. (Tr. at 108:15-18.) Self-imposed or not, Teran tacitly approved of her using the title, and Cathedral paid her commensurately. (*Id.* at 109:2-12.)

### 2.   Castle Stone and Tile, Inc.

In 2014, Cathedral won a construction project at 501 Madison Avenue that required union labor. (*Id.* at 88:12-89:6.) So Cathedral (a non-union shop) subcontracted that project to Capital Marble (a union shop). (*Id.*) But internal issues at Capital Marble caused it to shut down mid-project. (*Id.* at 81:17-24, 137:11-12.) This left Cathedral with a union job without a union sub to complete the installation. (*Id.* at 137:13-14.) Enter Castle Stone and Tile, Inc. (*Id.* at 137:11-21.)

Formed on August 15, 2014 by Sharon Amari (yes, 20-year-friend-of-Teran and Cathedral-employee, Sharon Amari), Castle Stone and Tile joined the Local 7 Tile Union and Marble Union, agreeing to their respective CBAs. (*See* Joint Ex. 8, Castle Articles of Inc.; Tr. at 81:10-82:9.)[2] Under the Tile CBA and Marble CBA, Castle was required to remit benefit contributions to Plaintiffs for every hour of work performed by Castle within the trade and geographical jurisdiction of the Tile Union and Marble Union, at contribution rates specified in Schedules set forth in the CBAs. (*See* JPTO at 4; Joint Ex. 1 ("Tile CBA") at 12-20 & Sch. A; Joint Ex. 2 ("Marble CBA") at 11-14 & Sch. C; Joint Ex. 5, Tile Funds Collection Policy; Pls.' Ex. 24, Marble Funds Collection Policy.) The CBAs also require Castle to submit to an audit of its books

---

[2] Amari did not physically sign the Tile CBA and Marble CBA until September 2, 2015 due to a clerical error. (Tr. at 82:21-84:21.) But nobody disputes that Amari assented to the CBAs shortly after forming Castle in 2014. (*Id.* at 82:7-15.)

and records to ensure compliance with its contribution obligation. (*See* Tile CBA at 17; Marble CBA at 14.)[3]

Castle thus entered the industry as a Local 7-affiliated subcontractor installing tile, marble, granite, porcelain, and ceramic. (*See* JPTO at 4.) And just four days after incorporation, Castle apparently won then invoiced Cathedral for the 501 Madison job. (Joint Ex. 12, Castle-Cathedral Job Invoices; Tr. at 88:12-89:9.) Castle thus filled the Capital-created void and completed the job with Local 7 labor. (Tr. at 88:12-89:9, 137:5-17.)

### 3. The Castle-Cathedral Relationship

From 2014 to 2017, Teran, through Cathedral, bid on and won several projects requiring union labor for the installation of tile or marble. He used various union installers as subcontractors to complete Cathedral's union jobs, and he awarded five such subcontracts (including 501 Madison) to Castle for the installation of tile or marble. (*Id.* at 111:14-19, 123:19-124:2; Joint Ex. 12, Castle-Cathedral Job Invoices.)

### a. Sharon Amari's Dual Roles

Amari, though founder, president, and sole officer of Castle—indeed Castle's only permanent employee, responsible for bookkeeping, payroll, banking, invoicing, and insurance—never left her position with Cathedral. (*See* JPTO at 4-5; Tr. at 87:12-24, 91:12-14, 117:12-14.) She listed her home as Castle's place of incorporation, but Castle paid neither rent nor utilities there. (*See* JPTO at 4-5; Tr. at 85:4-25.) And she continued to work regular hours (typically 8:00am to 6:30pm) at Cathedral's office,

---

[3] The relevant provisions of the CBAs are described in greater detail in the damages section.

where she took Castle's calls and tended both her Castle and Cathedral job responsibilities. (Tr. at 85:4-86:17, 102:12-23.)[4]

Sometimes, those job responsibilities overlapped. She served simultaneously as bookkeeper for Castle and Cathedral.[5] She invoiced Cathedral for Castle labor, then processed the Castle invoices into Cathedral's books and records. (*Id.* at 134:23-137:4.) And when Teran authorized Cathedral to make a payment toward a Castle invoice, Amari sometimes signed the check as the payer (Cathedral) and endorsed it as the payee (Castle). (*Id.* at 124:3-125:23.) Even when Cathedral won a union project from a general contractor and awarded that contract to Castle, Amari continued to correspond with those general contractors as Cathedral's Vice President or point of contact. (*See, e.g.*, Pls.' Exs. 15-1, 15-2, 19, 20, 21.) There is no evidence showing that Amari spoke to anyone, let alone general contractors, from a Castle email account with a Castle signature.

### b.  Castle Subcontracts with Cathedral

Cathedral awarded Castle five subcontracts for projects requiring union labor to install tile or marble: (1) 501 Madison Avenue; (2) 25 Madison Avenue; (3) 225 Park Avenue South; (4) 75 Rockefeller Plaza; and (5) 1407 Broadway. (Tr. at 70:17-20, 72:8-12, 123:19-124:2; Joint Ex. 12, Castle-Cathedral Job Invoices.) These subcontracts represent the entirety of Castle's work history. (Tr. at 87:25-88:5.) Castle never bid on a non-Cathedral project, and Castle bid on Cathedral projects only when Teran solicited a bid from Amari. (*Id.* at 91:7-8, 93:8-10, 113:4-18, 114:19-25.) She testified that "[Teran] would come to me and say, hey, I want to do – to know if you're interested in this

---

[4] Castle did have a different phone number than Cathedral. And yet Amari listed Cathedral's number on the Tile CBA.

[5] Amari also served as bookkeeper for Teran's real estate holding company, "16 Filmore." (Tr. at 147:18-20; 148:6-18.)

union job." (*Id*. at 113:6-7.) Then, Amari testified, she would review the project and submit a bid. (*Id*. at 114:23-25.)

Whereas Cathedral used a full-time estimator for construction projects (who worked in Cathedral's office), Amari testified that she, though lacking an architectural background and having never participated in estimating for Cathedral,[6] put together Castle's bid estimates. (*Id*. at 104:16-18, 113:7-9, 115:1-116:21, 117:17-118:7; 118:17-23.) After Amari orally submitted a bid on behalf of Castle, she testified that she and Teran would verbally negotiate the price of the subcontract between Castle and Cathedral. (*Id*. at 113:4-14, 114:19-25, 117:4-15, 122:2-10.) There is no evidence to suggest that Amari ever decided against submitting a bid after Teran asked. Nor is there evidence that Castle ever lost out on a Cathedral project once it submitted a bid.

After Cathedral formally awarded Castle a project, Amari called Local 7 for labor—Castle did not employ any workers on a full-time basis. (*Id.* at 87:3-11.) But evidence at trial showed that when Castle did not have a project, some of its Local 7 employees would then work for Cathedral, performing non-union work. (*See* JPTO 5-6; Tr. at 11:20-12:2, 13:1-3, 23:2-16.) For example, Jefferson Sanchez worked the 75 Rockefeller project for Castle as a member of Local 7, then, after that project ended, he went to work for Cathedral "because Castle was out of work." (Tr. at 23:2-16.) In both instances, *i.e.*, working for Castle and for Cathedral, Sanchez testified that Teran hired him. (*Id.*) Tax records show that Castle and Cathedral shared several other employees beyond Amari and Sanchez, including Louis Guachichulca, Sotero Payan, Ioannis Tsiatis, and Romano Payonne. (*See* JPTO at 5-6; *see also* Pls.' Exs. 13-14; Joint Exs. 9-11, 13.)

---

[6] Amari testified that she previously owned a marble supply and installation company for ten years but offered no other evidence about this company. (Tr. at 139:13-140:2.)

On the jobsite, Castle used Cathedral's equipment and materials (free of charge), such as tile and grout, because Castle owned no such equipment or materials of its own. (JPTO at 5.) And Teran and John Snow (a Cathedral supervisor) supervised Castle employees on Castle projects. (*Id.*; Tr. at 19:4-9, 143:3-5.) Amari testified that Teran went to jobsites daily because "they were his contracts," and "since it was his project[,] he oversaw his project." (Tr. at 143:3-9.) She did not supervise Castle employees, and at least one employee, Louis Guachichulca, could not recall ever seeing her at a Castle project. (*Id.* at 13:25-14:5.)  She testified that she went to worksites weekly to speak to the foreman about labor needs but also that "I don't have to go all the time because they are union men so they are reporting back to me, letting me know if they needed anything or more men." (*Id.* at 149:12-16.)

     *c.*   *Cathedral's Payments and Non-Payments to Castle*

Castle invoiced Cathedral for its five subcontracts, which meant that Amari made the invoice for Castle, then processed it for Cathedral. These invoices, four of which are based on Amari's estimates, cover only labor costs. (*See* JPTO at 5; Tr., 135:4-136:11.) Here's how they broke down:

- August 19, 2014, 501 Madison Avenue (which Castle assumed from Capital Marble, *i.e.*, not Amari's estimate): $142,604.33.

- August 5, 2015, 25 Madison Avenue: $65,000.00.

- September 15, 2015, 225 Park Avenue South: $210,000.00.

- November 24, 2015, 75 Rockefeller Plaza: $450,000.00.

- January 31, 2017, 1407 Broadway: $235,000.00.

(*See* Joint Ex. 12, Castle-Cathedral Job Invoices.) Cathedral made many payments to Castle; all of which went to these open invoices. (Tr. at 94:19-95:7.) But Cathedral made these payments seemingly at random—both in time and in amount. (*See* Joint Ex. 14, Castle General Ledger, at 22-24; JPTO at 5-6; Tr. at 127:24-128:1, 138:5-15.) Amari explained away these irregular payments, testifying that "Cathedral was writing a check for what they could give at that time." (*See* JPTO at 5-6; Tr. at 96:2-99:1, 99:17-20.)

When Cathedral did make payments, however, it frequently paid a sum sufficient to keep Castle in the black by injecting just enough cash to enable Castle to cover impending payroll, costs, taxes, and union contributions. (*See generally* Joint Ex. 14, Castle General Ledger, at 1-22; Tr. at 96:2-100:18.) Amari provided vague testimony about how Cathedral, time and again, paid the sufficient, or close to sufficient, amount to cover Castle's needs. Although she and Teran did not negotiate payments per week or per job, she testified that she would tell Teran that she needed money for payroll—"to get funds and . . . to get payment on an invoice so the men can be paid"—then Teran authorized a payment. (Tr. at 99:17-100:18.) When asked how Cathedral knew to pay specific amounts for payroll, *e.g.*, $8,500, Amari just pointed back to the overall invoice: "Eddie Teran gets a report

that shows what [are] open invoices and he decides what gets paid." (*Id*. at 125:20-126:14.) What she did not say, but what is clear from the ledgers, is that Teran knew the precise amount to cover those forthcoming bills. (*See generally* Joint Ex. 14, Castle General Ledger, at 1-22.)

When Teran did pay Castle, Amari testified about how she prioritized where those funds went. The union benefits received the lowest priority: "Whatever got paid by Cathedral in this case would go to the employees first and whatever was left over would be paid for taxes. . . . When there wasn't enough money, the benefits were what got held up." (Tr. at 129:1-6.) And when there "wasn't enough," and invoices went unpaid (which was often), Amari, as Castle's owner and officer, did nothing more than ask for payment (if even that)—she did not file a mechanic's lien or sue Cathedral for its unpaid invoices because she "didn't feel it was necessary." (*Id*. at 100, 126, 129-130.) As Castle's general ledger shows, Cathedral owes Castle outstanding receivables of at least $163,000. (Joint Ex. 14, Castle General Ledger, at 22; Tr. at 93:11-95:7.) Amari has never attempted to recoup those funds.

Unlike her company, Amari did get paid—just not by Castle. In fact, she never earned compensation from Castle, not a salary, a draw, or an equity distribution. (Tr. at 91:15-20; 103:25-104:2, 144:20-22, 138:3-8, 153:22-154:9.) Rather, while she owned Castle on paper and earned nothing in return, Cathedral paid her $109,668 and $131,300 in 2015 and 2016 respectively. (Pls.' Ex. 13; Tr. at 103:2-104:2, 127:6-10.) Castle ceased operating in 2017 around the time of this suit, *i.e.*, when Local 7 began investigating Castle's delinquent contributions. (Tr. at 130:1-8.) And at the time of trial, in July 2021, Amari still worked for Cathedral, who paid her a salary of $118,000 in 2020. (*Id*. at 127:4-17.)

The Castle-Cathedral, Amari-Teran relationship left others with the impression that the companies, though nominally two entities, were run by one person. From the perspective of employees common to Castle and Cathedral, they "only worked for [Teran]," (*id.* at 11:10-12:2, 19:4-9); he was their supervisor and their employer, (*id.* at 13:1-24, 19:4-9, 20:15-21). Even Castle's accountant thought Cathedral "was a non-union company of Castle Stone" and readily provided the Local 7 auditor (then reviewing Castle's records) with Cathedral's records. (*Id.* at 53:21-54:6.) That impression was evident at trial and remains so in Castle's post-trial submissions. So focused was, and is, Castle on defending Cathedral, an outside observer watching proceedings for the day or reading Castle's submissions, would be surprised to learn that it was Cathedral—not Castle—that defaulted and failed to defend itself at trial.[7]

## B.   Conclusions of Law

Plaintiffs argue that Castle and Cathedral constitute a single employer and are alter egos of one another. The court agrees. The facts established at trial show that the Castle-Cathedral relationship satisfies the single employer and alter ego doctrines. Thus, (1) Cathedral, a non-signatory to the Castle-signed CBAs, is nonetheless bound to and liable for contributions under those CBAs, and (2) Defendants are jointly and severally liable for both Castle's and Cathedral's unpaid benefit contributions and related damages.

---

[7] At least one court observer was familiar with these proceedings. That was Ed Teran's corporate counsel. (Tr. at 133:24-134:17.) So while Teran stopped paying counsel to represent Cathedral in this matter following Defendants' motion for summary judgment and Plaintiffs' amended complaint, he could afford to send his corporate counsel (a different law firm) to attend trial for the day.

Case 1:17-cv-03187-NGG-RER   Document 73   Filed 06/08/22   Page 13 of 40 PageID #: 2343

1.  Single Employer Doctrine

    a.  *Legal Standard*

Under the single employer doctrine, a collective bargaining agreement binding on one employer may be enforced against a non-signatory employer if (1) the two employers constitute a "single employer," and (2) the employees of the companies constitute a "single appropriate bargaining unit." *See Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001).[8]

"Separate companies are considered a single employer if they are part of a single integrated enterprise." *See Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 747 (2d Cir. 1996). To assess whether multiple entities constitute a "single employer," courts consider four non-dispositive factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *See id.* "Family connections and the common use of facilities and equipment are also relevant." *Brown*, 250 F.3d at 128 n.2. But "not every factor need be present, and no particular factor is controlling." *Lihli Fashions*, 80 F.3d at 747. "Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an arm's length relationship found among the unintegrated companies." *Id.*

In order to bind a non-signatory to the terms of a CBA under the single employer doctrine, though, plaintiffs must also establish that the signatory and non-signatory to a CBA "represent an appropriate employee bargaining unit." *Ferrara v. Happy Time Trucking, LLC*, 436 F. Supp. 3d 606, 617 (E.D.N.Y. 2020). Here, "attention shifts from the control, structure and ownership of the employer to the community of interests of the employees." *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 264 (E.D.N.Y.

---

[8] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

13

2012). To determine whether a community of interests exist, courts consider "factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange." *Brown*, 250 F.3d at 128 n.2.

   *b.* *Application*

Castle and Cathedral constitute a single employer and single employee bargaining unit. One could hardly think up a clearer case. Castle was formed to address a Cathedral need. Castle's owner worked for Cathedral, and Cathedral paid her a six-figure salary. Castle bid only on Cathedral projects, and even then, only when Cathedral asked. Cathedral's owner supervised Castle employees using Cathedral equipment, and those employees viewed him as their employer. Cathedral paid Castle invoices at its convenience, and Castle made no effort to collect unpaid invoices. In sum, despite Amari's muddying and often misdirecting testimony, the facts presented at trial show that Castle and Cathedral operated as a single integrated enterprise absent an arm's length relationship. An assessment of the relevant factors confirms this conclusion.

First, Castle and Cathedral maintained interrelated operations. Amari formed Castle to replace Cathedral's union subcontractor on the union job at 501 Madison. Castle bid only on Cathedral projects—and bid only when Ed Teran asked Amari to do so. They also shared employees (*e.g.*, Amari, Jefferson Sanchez, and Louis Guachichulca, among others), supervisors (Teran and John Snow), and equipment (Castle used Cathedral equipment). *See Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 341 (E.D.N.Y. 2017). Moreover, while Castle listed its office as Amari's residence, it is clear that address meant little in reality. Castle paid neither rent nor utilities there, and Amari testified

that she typically worked ten-hour days from Cathedral's office, where Castle received its calls. The payment history between Castle and Cathedral further establishes the interrelatedness of their operations. *See Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 350 (N.D.N.Y. 2000) (finding interrelated operations, in part, because "companies made payments to one another and made payments on behalf of one another"). Those records show that Cathedral frequently paid Castle in sums and at times that allowed Castle to satisfy its obligations like payroll, taxes, and union benefits.

Second, Castle and Cathedral shared common management: Amari as Vice President at Cathedral and President at Castle; Teran as owner and supervisor at Cathedral and supervisor at Castle; and John Snow as supervisor at both Cathedral and Castle. *See Mauro's Plumbing*, 84 F. Supp. 2d at 349-50 (noting that courts find common management between two entities when employees hold management responsibilities at both entities and when the entities share employees). Third, so clear was Teran's control over Castle—in formation, in deciding what projects to bid, in supervision, and in payment (how much and when)—that common ownership also weighs in favor of single employer status notwithstanding Amari's nominal ownership.

Fourth, Castle and Cathedral shared centralized control of labor relations. It is true that Castle used Local 7 labor for its projects. But the evidence at trial established that (1) a revolving door existed among several Castle and Cathedral employees; (2) Teran hired those shared employees; and (3) those employees recognized Teran as their employer. *See High Performance Floors, Inc.*, 233 F. Supp. 3d at 345-46. Moreover, Teran supervised Castle employees at Castle worksites daily because, as Amari testified,

they were "his contracts" and "his projects." (Tr., 143:3-9.) These facts show a centralized control of labor relations.

Even the additional factors, family connections and the common use of facilities and equipment, support a single employer finding. Castle used Cathedral's facilities (the 16 Filmore office) and equipment (tile and grout). And Amari and Teran, though not family, share a 20-year friendship, representing a close bond of history or affection which suggests that "the entities did not function at arm's length." *See High Performance Floors, Inc.*, 233 F. Supp. 3d at 346 (finding that friendship lasting more than 30 years supported single-employer relationship). The court thus finds that Castle and Cathedral constitute a single employer.

Castle and Cathedral also represent a single employee bargaining unit because the community of interests among employees of Castle and Cathedral were similar, if not identical. Employees of Castle and Cathedral did the same work (marble and tile installation), under the same conditions, in the same geographic area (New York City). They worked interchangeably for both companies. They were hired by the same person (Teran); they were supervised by the same people (Teran and Snow); and they used the same equipment (Cathedral's). These facts establish that an employee, whether of Castle or Cathedral, shared the same community of interests.

For the reasons stated above, the court holds that Castle and Cathedral represent a single employer and single bargaining unit. As a result, Cathedral is bound to the Castle-signed CBAs, and Defendants are jointly and severally liable for their respective damages owed to Plaintiffs.

2. Alter Ego

a. *Legal Standard*

"The alter ego doctrine provides an[other] analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807 v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). But the alter ego doctrine, "while having the same binding effect on a non-signatory as the single employer/single unit doctrine," and sharing several overlapping factors, "is conceptually distinct." *Brown*, 250 F.3d at 128 n.3. That distinction, however, can prove difficult to pinpoint— especially where, as here, the alleged alter egos are parallel companies operating concurrently. *See Barbera v. R. Rio Trucking*, No. 03-CV-1508 (SLT) (AKT), 2010 WL 3928553, at *9 (E.D.N.Y. Sept. 30, 2010); *see also Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (rejecting the argument "that alter ego status cannot apply where the entities exist simultaneously").

Putting this blurred distinction aside, the alter ego doctrine focuses on "the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Lihli Fashions Corp.*, 80 F.3d at 748-49. Its purpose "is to prevent an employer from gaining an unearned advantage in his labor activities by evading his responsibilities under a CBA." *Barbera*, 2010 WL 3928553, at *10. The Second Circuit therefore instructs courts to flexibly apply the alter ego doctrine, weighing the circumstances of the individual case with that purpose in mind. *See Brown*, 250 F.3d at 128 n.3. In doing so, courts analyze seven defined hallmarks of an alter ego relationship: whether the two enterprises have substantially identical (1) management, (2) business purpose, (3) operation, (4) equipment, (5) customers, (6) supervision, and (7) ownership. *See id.* Anti-union animus is also relevant, but "a showing of anti-union animus is

not required." *High Performance Floors, Inc.*, 233 F. Supp. 3d at
345.

   *b. Application*

The evidence at trial established that Castle, from inception, was
the alter ego of Cathedral. Both Amari's testimony and Castle's
bank account show how Ed Teran used Castle as a vehicle to win,
control, and supervise certain union projects, without ever bind-
ing Cathedral to the relevant CBAs. Castle worked when Teran
wanted it to work, and Castle got paid when Teran wanted to
pay. Even when he did pay, remitting union benefits was Castle's
lowest stated priority:

> THE COURT: You're saying that the only thing that you
> didn't receive payment for of the invoices was the amount of
> money that would have been necessary to pay the obligation
> to the pension fund?

> [Amari]: Some of that, yes, and obviously anything left over
> would have been a profit into the company.

(Tr. at 129:16-21; *see also id.* at 128:6-10.) Of course, there was
never anything left over.

The evidence at trial showed that Teran used Castle to evade
costs and fees connected to the CBAs because it allowed Cathe-
dral to directly perform—and control—union projects without
signing the union CBAs. The court thus agrees with Plaintiffs that
Castle was Cathedral's alter ego. The hallmarks of the alter ego
doctrine confirm this conclusion.

   i. <u>Ownership, Management & Supervision</u>

As the single employer discussion in the preceding section made
clear, the evidence at trial established that Castle and Cathedral
share common ownership (Amari on paper, Teran in fact), man-
agement (Amari and Teran), and supervision (Teran and Snow).
Castle can argue only what Castle put on paper—that Amari

wrote Castle's checks, that Castle filed its own tax returns, and that Castle and Cathedral nominally shared no common owners, officers, or managers. In other words, Castle can argue only form, ignore substance, and make the same arguments that most every alter ego can satisfy. These arguments fail to account for the intertwined relationship between Castle and Cathedral and between Amari and Teran. Thus, Castle and Cathedral's shared ownership, management, and supervision supports an alter ego relationship.

### ii.    Business Purpose

"Two entities may be found to have a common business purpose when, for example, the principal work they perform is the same, particularly when that work is performed in the same geographic area." *High Performance Floors, Inc.*, 233 F. Supp. 3d at 338. There is no dispute that Castle and Cathedral performed tile and marble installation or that they did so in the same geographic area. Still, Castle contends that their purposes differed because Castle performed union work, and Cathedral performed non-union work. But "differentiating among entities by pointing out that one performs union work and the other does not will not defeat a finding of common business purpose." *Id.*; *see also Happy Time Trucking, LLC*, 436 F. Supp. 3d at 620 (finding that the proffered union, non-union distinction "insufficient to dispute alter ego status"). Thus, Castle and Cathedral's shared business purpose supports an alter ego relationship.

### iii.    Customers

Sharing clients and customers also indicates an alter ego relationship. Here, Castle's only client was Cathedral. This factor therefore does little to assist the court in its alter ego analysis. Whatever force it has, however, it suggests an alter ego relationship.

19

iv.   <u>Operations & Equipment</u>

Companies may also be found to be alter egos when they share equipment, tools, supplies, or other resources in connection with their operations. *See High Performance Floors, Inc.*, 233 F. Supp. 3d at 343 (collecting cases); *see also Moore v. Navillus Tile, Inc.*, 276 F. Supp. 3d 110, 150 (S.D.N.Y. 2017) (overlapping "offices, telephones, computer systems, books and records, insurance policies, bank accounts, human resources, payroll systems, [or] professional services" may all be relevant to this factor), *vacated pursuant to settlement agreement*, No. 14-CV-8326 (CM) (JLC), 2018 WL 7048697 (S.D.N.Y. Oct. 26, 2018). As the single employer discussion made clear, Castle did not have its own equipment and material, yet it used Cathedral's as needed and at no cost.

Defendants also shared operations. Amari worked at Cathedral's office and received Castle's calls there. She served as bookkeeper for both Castle and Cathedral. And Castle and Cathedral used the same accountant—who believed that Cathedral "was a non-union company of Castle." (Tr. at 53:21-54:6.) Castle can again point only to what's on paper, *e.g.*, separate bank accounts, separate taxes, and separate offices. But the facts at trial made clear that there was only one office, and that Amari had significant authority over both entities' banking operations. These shared facilities, operations, and equipment represent "significant circumstantial evidence of [Castle and Cathedral's] alter ego status." *See Bourgal v. Robco Contracting Enters., Ltd.*, 969 F. Supp. 854, 863 (E.D.N.Y. 1997), *aff'd*, 182 F.3d 898 (2d Cir. 1999).

\*       \*       \*

The facts and evidence at trial established that Castle and Cathedral constitute a single employer and single bargaining unit and that Castle and Cathedral are alter egos of one another. Defendants' single employer/alter ego status began with Castle's

incorporation and ended when it ceased operations, with Cathedral owing at least $163,000 in open invoices. As a result of their single employer/alter ego status, Cathedral is bound to the Castle-signed CBAs, and Defendants are jointly and severally liable for their delinquent benefit contributions, interest, liquidated damages, audit costs, and attorneys' fees. The amount of those damages and costs is subject to recalculation by Plaintiffs in accordance with the following section.

## II. DAMAGES

Castle failed to offer any evidence to rebut Plaintiffs' damages calculations. As explained below, however, Plaintiffs' proposed damages contain significant defects. Thus, Plaintiffs must recalculate and resubmit their alleged damages.

### A. Findings of Fact

Castle is a party to two collective bargaining agreements: the Tile CBA and the Marble CBA. So too is Cathedral because of its single employer/alter ego status with Castle.

#### 1. Relevant CBA Provisions

The Tile and Marble CBAs require bound employers to remit benefit contributions pursuant to specified rate schedules for every hour of work performed within the trade and geographical jurisdiction of the Tile and Marble Unions. (*See* JPTO at 4; Tile CBA at 12-20 & Sch. A; Marble CBA at 11-14 & Sch. C.) Schedule A of the Tile CBA provides the applicable wage and contribution rates for each type of Local 7 Tile Union member, such as Tile Setter and Tile Finisher; Schedule C of the Marble CBA provides the applicable wage and contribution rates for each type of Local 7 Marble Union member, such as Marble Setter and Marble Finisher.

Schedule A covers "Fringe Benefits," including International Pension, Local Pension, Promotion, International Masonry Institute

("IMI"), Local 7 Training Fund, Annuity, Welfare, Retiree Welfare, and Supplemental; Schedule C covers the same, although it refers to Retirement Fund rather than Retiree Welfare. (*See* Tile CBA, Sch. A; Marble CBA, Sch. C.)

The Tile CBA provides that "[a]ll fringe benefit fund contributions shall be paid on the basis of Tile Setter/Finisher hours paid for, except that IPF, IMI, Tile Promotion and Local Pension shall be paid on the basis of hours worked." (Tile CBA, Article IX, Section 3(C).)[9]  The Marble CBA requires contributions pursuant to the rate schedules in accordance with hours worked. (*See generally* Marble CBA, Article XIX.) Plaintiffs act as collection agents for these benefit contributions. The CBAs also employ collection policies. (Joint Ex. 5, Tile Funds Collection Policy ("Tile Collection Policy"); Pls.' Ex. 24, Marble Funds Collection Policy ("Marble Collection Policy").)[10]

The Tile and Marble CBAs provide the consequences for when a bound employer is delinquent in its contributions to Plaintiffs. Under the Tile CBA (under Article IX, Section 3, "Fringe Benefit Funds") and the Tile Collection Policy (for "Delinquent Fringe Benefit Contributions"), interest will accrue at the rate of 10% per annum (calculated from the due date) for the local funds and 15% per annum (calculated from the due date) for the international funds, plus liquidated damages of 20% of the amount of delinquent contributions owing, and reasonable attorneys' fees and costs incurred in connection with collection of the delinquent contributions. (Tile CBA, Article IX, Section 3(L); *see also* Tile Collection Policy.)

---

[9] Hours worked means hours worked without overtime, and hours paid includes an overtime premium.

[10] The Tile Collection Policy refers only to Tile Layers Local Union 52 Pension Fund (not Local Union 88) but provides for the same collection procedure in the CBA. (*See* Joint Ex. 5, Tile Funds Collection Policy at 1.)

Under the Marble CBA (under Article XX, "Fringe Benefit Proce-dures and Protection") and the Marble Industry Funds Collection Policy (under Step 1, discussing "fringe benefit contributions"), interest will accrue at the rate of 10%, plus liquidated damages of 20% of the amount of delinquent contributions owing, attor-neys' fees at 25% of the contribution delinquency, and actual audit costs. (Marble CBA, Article XX(6); *see also* Marble Collec-tion Policy, at Step 1.) Unlike the Tile CBA, the Marble CBA does not provide for a separate 15% interest rate for international funds.

The Tile and Marble CBAs also include provisions concerning the use of non-signatory subcontractors. Article XVI of the Tile CBA provides:

> No employer, having a contract requiring the performance in connection therewith of labor within the classification set forth in this Agreement, shall subcontract, sell, sublet and/or assign to any other person, firm, corporate or entity who is not signatory to or bound by this Agreement, the perfor-mance of such contracts including the Portland cement float coat or any other portion of the contract so far as the labor is required to be performed thereunder. The Employer shall not be responsible for payment of fringe benefits of a signa-tory subcontractor.

(Tile CBA, Article XVI.) Article XVII of the Marble CBA provides:

> If the Employer hereunder subcontracts all or any part of the work covered under this Agreement to be performed at a jobsite regarding alteration, repair or construction of a build-ing structure, or other work, it is agreed that the Employer shall subcontract the work covered under this Agreement only to a subcontractor signatory to this Agreement.

(Marble CBA, Article XVII.)

2. First Castle Audit: 2015-2016

In 2016, Plaintiffs hired Marshall & Moss Compliance Services to audit Castle.  Michael Sarosy performed the audit, which he completed at Castle's accountant's office. (Tr. at 31:7-8.)[11] Sarosy first audited the period of July 1, 2015 through June 30, 2016. (*Id*. at 31:9-18; Pls.' Ex. 4, Castle Payroll v. Remittance.)

In conducting the audit, Sarosy completed a Monthly Payroll v. Remittance Worksheet. (*See* Pls.' Ex. 4, Castle Payroll v. Remittance.) This Worksheet compiles information about the number of hours worked by Castle employees from two sources: (1) the hours as reported by Castle on Plaintiffs' fund administrator's website;[12] and (2) the hours as reflected in Castle's internal payroll records. (Tr. at 29:8-34:20.) With this information, the auditor can determine whether any discrepancies exist between the hours Castle reported to Plaintiffs and the payroll hours Castle made internally. (*Id.*) Where the payroll hours are greater than the reported hours, the auditor can calculate the amount in delinquent contributions.

The Monthly Payroll v. Remittance Worksheet indicated that Castle failed to report 1,231 hours reflected in its payroll records. (*See* Pls.' Ex. 4, Castle Payroll v. Remittance.) Castle thus failed to remit benefit contributions to Plaintiffs for 1,231 hours worked by its employees who were Local 7 members. (*Id.*; Tr. at 31:10-34:24.)[13] This Worksheet provides detail on the deficient hours for each Castle employee as well as each employee's status and

---

[11] Sarosy later came to work as an auditor for Local 7.

[12] D.H. Cook is the third-party fund administrator. (Tr. at 29:9-16.)

[13] The Monthly Payroll vs. Remittance Worksheet distinguishes between "Hours Paid" and "Hours Worked" because the Tile CBA and the Marble CBA require some benefit funds to receive a contribution for every hour worked, without any overtime premium included, whereas other benefit funds receive a contribution for every hour paid, which includes any overtime premium. (Tr. at 33:22-34:4; Tile CBA, Article IX, Section 3(C).)

position within Local 7, *e.g.*, tile setter, tile finisher, marble setter, and marble finisher. (Pls.' Ex. 4, Castle Payroll v. Remittance; Tr. at 31:9-34:24.) This information allowed Sarosy to determine Castle's delinquent contributions and attempt to calculate accompanying damages arising from the deficient hours by multiplying the deficient hours for each Castle employee by the applicable benefit contribution rate in (1) Schedule A of the Tile CBA, and (2) Schedule C of the Marble CBA. (*See* Pls.' Ex. 4, Castle Payroll v. Remittance; Tr. at 31:10-34:24.) From there, Sarosy applied the formula for interest, liquidated damages, and audit costs as set forth in the Tile CBA and Marble CBA. (*See* Pls.' Ex. 5, First Castle Tile Audit; Pls.' Ex. 6, First Castle Marble Audit.)

Plaintiffs offered, and the court accepted, several exhibits about Sarosy's audit, including the Final Castle 2015-16 Audit Reports for the Tile and Marble Funds. (Pls. Ex. 1, Final 2015-16 Castle Tile Audit; Pls.' Ex. 2, Final 2015-16 Castle Marble Audit.)

These final reports and summaries covered the first audit period from July 1, 2015 through June 30, 2016. They provide a breakdown by local union within Local Union 7 (*e.g.*, Local Union 52 (Tile Setters) and Local Union 88 (Tile Finishers); Local Union 4 (Marble Setters) and Local Union 20 (Marble Finishers)), as well as a breakdown of the delinquent benefit contributions to the International and Local Funds.

The Final 2015-16 Audit Reports include the following categories of delinquencies:

- Delinquent Contributions to International Funds:
  - International Pension.
  - IU Pension Surcharge (Tile Unions only).
  - IMI.
  - Bricklayers and Allied Craftworkers Political Action Committee ("PAC").
  - International Dues.
- Delinquent Contributions to Local Funds:
  - Welfare.
  - Retiree Welfare.
  - Local Pension.
  - Vacation.
  - Supplemental.
  - Annuity.
  - Promotion.
  - Training Fund.
  - Building Fund.
  - Defense Fund.
  - Local PAC.
  - Local Dues 1.
  - Local Dues 2.

(Pls.' Ex. 1, Final 2015-16 Castle Tile Audit at 2; Pls.' Ex. 2, Final 2015-16 Castle Marble Audit at 2.) Of those categories, however,

several benefits are not "Fringe Benefits" as defined under Schedules A and C of the Tile and Marble CBAs respectively. Those non-fringe benefit categories include Bricklayers and Allied Craftworkers PAC; International Dues; Vacation; Local PAC; Defense Fund; Building Fund; and Local Dues 1 and 2—collectively, the "non-Plaintiff funds."

For each category of benefits, the Final 2015-16 Reports include a breakdown of the total Deficiency Amount (unpaid hours multiplied by the contribution rate defined in the rate schedules); the Allocated Interest (which Plaintiffs compounded annually at the 10% or 15% rate); the Liquidated Damages (applied only to ERISA funds at 20% of the unpaid principal); and Allocated Audit Costs.

Because of the errors in Plaintiffs' calculation, the court omits the specific figures that Plaintiffs submitted. Rather, as explained below, Plaintiffs are directed to recalculate and resubmit their request for damages.

### 3.   Second Castle Audit: 2016-2017

On November 3, 3020, Plaintiffs filed an Amended Complaint, adding a claim for delinquent contributions owed by Castle to Plaintiffs during the period of July 1, 2016 through June 16, 2017. (*See* Am. Compl. (Dkt. 39) ¶¶ 19-21.) Defendants Cathedral and Castle filed Amended Answers on November 17, 2020 and November 19, 2020, respectively. (*See* Cathedral Answer (Dkt. 40); Castle Answer (Dkt. 41).)

To determine Castle's delinquent contributions from this period, Plaintiffs rely on Castle's self-reported hours of Covered Work on Plaintiffs' fund administrator's website, which shows due and unpaid employer contributions to each specific Local Union (*e.g.*, Local 52 or Local 88). (*See* Joint Ex. 6, D.H. Cook Report, Castle Tile; Joint Ex. 7, D.H. Cook Report, Castle Marble; Tr. at 48:2-53:20.). Plaintiffs calculated the principal delinquency amounts

from the total amounts due on the administrator's website. But these total amounts due provide no breakdown as to which specific contribution category the unpaid delinquencies come from—there is just a single number for any given work period. (*See* Joint Ex. 6, D.H. Cook Report, Castle Tile; Joint Ex. 7, D.H. Cook Report, Castle Marble.) In other words, unlike the first Castle audit, these total amounts do not list a delinquency amount by contribution category, *e.g.*, Welfare, Local Pension, Annuity. As a result, the court cannot determine whether these total amounts due are overinclusive, encompassing contribution categories beyond Plaintiffs' collection remit. Nor is there a breakdown as to ERISA versus non-ERISA funds—a key detail to determine which delinquencies warrant liquidated damages. Moreover, the applicable rate schedule for the Tile CBA, Schedule A, ended December 5, 2016, but this audit runs through June 16, 2017. (The applicable rate schedule for the Marble CBA, Schedule C, ended January 1, 2018.)

Despite these deficiencies, Plaintiffs purport to provide a "true and correct" calculation of interest on these delinquent contributions. (*See* Harras Aff. (Dkt. 67-1) ¶¶ 4-5; Castle Tile Interest Calculation (Dkt. 67-3); Castle Marble Interest Calculation (Dkt. 67-4).) These calculations (screenshots of an Excel sheet ostensibly created by Plaintiffs' attorney) compound the issues described above and are insufficient to support a judgment for damages from interest or liquidated damages.

### 4.  Cathedral Audit

Sarosy also performed an audit of Cathedral for Plaintiffs. In performing this audit, Sarosy relied on Cathedral's tax forms—its NYS-45, 1099s, and W-2s for the period of July 1, 2015 through September 30, 2017. (Tr. at 55:4-6, 57:2-66:7.) Because Cathedral did not provide a copy of its weekly payroll records, Sarosy calculated the number of hours worked by each Cathedral employee by taking the total quarterly payment that Cathedral

made to each employee identified in the NYS-45 forms and dividing that figure by the applicable union wage rate. (*Id.* at 58:11-59:7.)

In calculating these hours, Sarosy included hours worked by Local 7 members and non-Local 7 members. He calculated both member sets because he presumed that the non-member Cathedral employees performed the same work covered in the Tile and Marble CBAs—a presumption that he inferred from Cathedral's business name, its relation to Castle, and its known business purpose of installing tile and marble. (Pls.' Ex. 9, Cathedral Payroll v. Remittance Worksheet; JPTO at 5-6; Tr. at 60:14-24.) Sarosy then used a Monthly Payroll vs. Remittance Worksheet to compare the hours worked by Cathedral employees against any hours for which Cathedral reported a remittance to Plaintiffs. Based on the Cathedral Monthly Payroll vs. Remittance Worksheet, Cathedral failed to remit contributions to Plaintiffs for 33,611.65 hours worked by its employees. (Pls.' Ex. 9, Cathedral Payroll v. Remittance Worksheet at 7.)

Sarosy also reviewed Cathedral's 1099s. These 1099s reflected cash disbursements to subcontractors. Sarosy identified 11 non-union subcontractors of Cathedral that either had a name indicating that it performed work covered by the Tile and Marble CBAs, had an address at the residence of a Local 7 member or former Local 7 member, or both. Sarosy testified that he reviewed Cathedral's disbursements for subcontractors because, assuming the Tile and Marble CBAs applied to Cathedral, he believed that Cathedral would be required to subcontract work covered by the Tile and Marble CBAs to union contractors only. He calculated the delinquent contributions owed to Plaintiffs based on Cathedral's disbursements to non-union subcontractors by dividing the total annual payment to the subcontractor, as reflected on the 1099, by the applicable union wage rate as reflected in either Schedule A of the Tile CBA or Schedule C of

the Marble CBA. This yielded an estimate of hours worked, which Sarosy then multiplied by the applicable benefit contribution rate, as reflected in either Schedule A of the Tile CBA or Schedule C of the Marble CBA.

Like the first Castle Audit, Sarosy issued a final audit report of his Cathedral findings in the same format as the first Castle Reports, using the same breakdown of contribution categories listed in the bulleted points above. This report provides a summary breakdown of delinquent contributions for specific categories within the Local Unions: Members; Non-Members; and 1099s (subcontractor employees). (Pls.' Exs. 7-8, 2015-17 Cathedral Audit Reports.) But, like the Castle Audits above, there are material issues in the calculations such that it would be distracting to discuss those final calculations here.

Neither Castle nor Cathedral offered any evidence to rebut, contradict, or allow for a more precise figure for the delinquencies alleged by Plaintiffs throughout the course of this litigation.

### B. Conclusions of Law

Neither party disputes the existence of the valid collective bargaining agreements between the parties, Castle's obligation to make the required contributions under those agreements, or Plaintiffs' right to enforce Castle's duties. *See* 29 U.S.C. §§ 1132(a)(3), 1145; *see also Gesualdi v. RRZ Trucking Co.*, No. 03-CV-3449 (ETB), 2011 WL 1988374, at *3-4 (E.D.N.Y. May 20, 2011). Nor do the parties dispute Castle's obligations to maintain certain records and to furnish to benefit plans, like Plaintiffs, such information needed for the plans' fulfillment of their reporting duties. *See* 29 U.S.C. § 1059(a)(1); *see also Gesualdi*, 2011 WL 1988374, at *4. As to damages, however, Castle incorrectly places the burden to establish the accuracy of Castle's and Cathedral's delinquent contributions and accompanying damages solely on Plaintiffs. But this misconstrues the appropriate burden-

shifting standard, which provides that if a plaintiff shows "(a) improper record-keeping by the defendants, (b) that employees performed work for which they were improperly compensated, and (c) the amount and extent of that work as a matter of just and reasonable inference," then the burden shifts to the employer-defendant to disprove damages. *See Reilly v. Reem Contracting Corp.*, 380 F. App'x 16, 20 (2d Cir. 2010) (citing *Combs v. King*, 764 F.2d 818 (11th Cir. 1985)).[14]

This rule advances the policies of ERISA because it imposes a burden that reflects (1) the employer's duties under ERISA, and (2) the fact that the employer is in the best position to know the number of hours worked. *See Demolition Workers Union v. Mackroyce Contracting Corp.*, No. 97-CV-4094 (LMM), 2000 WL 297244, at *7 (S.D.N.Y. Mar. 22, 2000). Therefore, if the employer fails to produce evidence that rebuts the trustees'

---

[14] The Second Circuit has not formally adopted this rule. *See id.*; *see also N.Y. State Teamsters Council Health and Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 182-83 (2d Cir. 1994). But it has described the *Combs* rule as a potential "remed[y] . . . appropriately tailored to preventing false reporting," *La Barbera v. J.D. Collyer Equip. Corp.*, 337 F.3d 132, 139 & n.3 (2d Cir. 2003), and has cited to it with approval, *see Jacobson v. Empire Elec. Contractors, Inc.*, 339 F. App'x 51, 53 (2d Cir. 2009). Other circuits have followed the Eleventh Circuit and applied this burden-shifting analysis when deciding ERISA actions. *See, e.g.*, *Mi. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 696-97 (6th Cir. 1994); *Brick Masons Pension Trust v. Industrial Fence & Supply Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988). So too have courts within the Eastern and Southern Districts of New York. *See, e.g.*, *Fuchs v. Tara Gen. Contracting, Inc.*, No. 06-CV-1282 (ETB), 2009 WL 2922840, at *7 (E.D.N.Y. Sept. 8, 2009); *Demolition Workers Union v. Mackroyce Contracting Corp.*, No. 97-CV-4094 (LMM), 2000 WL 297244, at *7 (S.D.N.Y. Mar. 22, 2000) (applying burden-shifting analysis and citing other cases that have done so); *Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc.*, No. 92-CV-2076 (JMA), 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993) (applying burden-shifting analysis). This court adopts and applies the burden-shifting rule here.

proposed damages, "the court may award damages to the trustee[s] even where the damages are an approximate amount." *Fuchs v. Tara Gen. Contracting, Inc.*, No. 06-CV-1282 (ETB), 2009 WL 2922840, at *7 (E.D.N.Y. Sept. 8, 2009).

Here, the utility of this rule proves salient. Defendants knew from the outset that the vast majority of damages flowed from Cathedral. After summary judgment, however, Cathedral defaulted, effectively removing itself from scrutiny at trial. Now, following the trial, Castle attempts to escape damages for both Castle and Cathedral—not by offering any evidence to the contrary, but by relying exclusively on the faulty premise that Plaintiffs must carry their burden to establish accurate damages and that an estimate does not suffice. Given Castle's failure, Plaintiffs have satisfied their burden by explaining how (and based on what materials) they estimated the alleged delinquency amounts owed by Castle and Cathedral. In other words, the court accepts Plaintiffs' proposed methodology to determine Defendants' contribution delinquency.

But the sufficiency of Plaintiffs' submission ends there, as it suffers from its own significant failures. Accordingly, before the court will order a judgment against Defendants, Plaintiffs must recalculate their requested damages and costs in accordance with this decision.

This will come as no surprise to Plaintiffs, who time and again provide courts in this District, including this court, with incomplete and error-ridden calculations as to damages. *See, e.g.*, *Trs. of Local 7 Tile Indus. Welfare Fund v. AM Tile Specialty Constr.*, No. 19-CV-1809 (RPK) (SJB), 2020 WL 7034025, at *7, *9-*11 (E.D.N.Y. Sept. 23, 2020), *report and recommendation adopted*, 2020 WL 7021646 (E.D.N.Y. Nov. 30, 2020); *Trs. of Local 7 Tile Indus. Welfare Fund v. All Flooring Solutions*, LLC, No. 19-CV-126 (ENV) (RLM), 2020 WL 9814088, at *9 (E.D.N.Y. Feb. 12,

2020); *Trs. of Local 7 Tile Indus. Welfare Fund v. Caesar Max Constr. Inc.*, No. 18-CV-1339 (FB) (LB), 2019 WL 1130727, at *8 (E.D.N.Y. Feb. 11, 2019), *report and recommendation adopted*, 2019 WL 1129430 (E.D.N.Y. Mar. 12, 2019); *Trs. of Local 7 Tile Indus. Welfare Fund v. Larsen Marble & Tile, LLC*, No. 18-CV-1025 (ARR) (SMG), 2018 WL 6363923, at *4 (E.D.N.Y. Nov. 19, 2018), *report and recommendation adopted as modified*, 2018 WL 6344188 (E.D.N.Y. Dec. 5, 2018); *Trs. of the Local 7 Tile Indus. Welfare Fund v. EAQ Constr. Corp.*, No. 14-CV-4097 (SJ) (CLP), 2016 WL 4540306, at *4 (E.D.N.Y. Aug. 12, 2016), *report and recommendation adopted*, 2016 WL 4536866 (E.D.N.Y. Aug. 30, 2016); *Trs. of the Local 7 Tile Indus. Welfare Fund v. Penn Valley Tile, Inc.*, No. 15-CV-3891 (MKB) (RER), 2016 WL 4384328 (E.D.N.Y. July 21, 2016), *report and recommendation adopted*, 2016 WL 4384717 (Aug. 16, 2016); *Trs. of the Local 7 Tile Indus. Welfare Fund v. EAQ Constr. Corp.*, No. 14-CV-4097 (E.D.N.Y. Aug. 24, 2015) (Dkt. 26), *report and recommendation adopted*, No. 14-CV-4097 (E.D.N.Y. Sept. 30, 2015) (Dkt. 30).[15]

In 2015, in a Report & Recommendation later adopted by this court, Judge Reyes warned Plaintiffs about their frequent failings:

> I would be remiss if I did not mention that this is not the first time that the law firm representing Plaintiffs, Virginia &

---

[15] That Plaintiffs continue to offer the same incorrect calculations is not troubling in itself—particularly not when, as here, the issues involve different parties bound to similar, or the same, agreement. What is troubling, however, is that Plaintiffs—represented by the same attorneys, using the same auditor—continue to offer this calculation without *any* reference to the now legion instances in which a court has rejected their position and done the work for them. It is one thing to disagree with these decisions, explain why, and attempt to persuade another court to see things their way. It is quite another to hide the ball, hope for the best, and leave it to the courts to clean up their mess. As officers of the court, attorneys are subject to duties of candor, decorum, and respect for the tribunal before which they appear. Plaintiffs have failed to uphold those basic precepts.

Ambinder LLP, has failed to provide the Court with accurate calculations and complete submissions. On a number of occasions this Court has had to recalculate various plaintiffs' damages because the documentation and calculations provided by plaintiffs' counsel were replete with inaccuracies. *In the future, if incorrect calculations are submitted to this Court, this Court will not recalculate and reconstruct damages based on what evidence is presented, but instead disallow recovery as a whole*. It is not the Court's job nor duty to perform such calculations in the first instance, rather the Court is to insure that such calculations presented are arithmetically sound and supported, both factually and legally.

*Trs. of the Local 7 Tile Indus. Welfare Fund v. Alp Stone, Inc.*, No. 12-CV-5974 (NGG) (RER), 2015 WL 4094615, at *6 (E.D.N.Y. June 17, 2015) (emphasis added), *report and recommendation adopted*, 2015 WL 4112449 (E.D.N.Y. July 7, 2015). As the lengthy string cite above makes clear, Plaintiffs ignored that warning. [16] But trial courts are not "green-eyeshade accountants," *Fox v. Vice*, 563 U.S. 826, 838 (2011), and they do not work for the Trustees of Local 7. Because Plaintiffs seem to think otherwise, judgment as to damages is RESERVED. So too is consideration of Plaintiffs' request for attorneys' fees and costs and auditor costs. Plaintiffs must do—and show—their work before any judgment for damages is granted. They are DIRECTED to

---

[16] Plaintiffs have also ignored more recent public admonishment. In 2019, Judge Bloom noted that "this [wa]s not the first time Plaintiffs have filed inadequate papers in support of a motion for default judgment." *Caesar Max Const. Inc.*, 2019 WL 1130727, at *8 n.6 (collecting cases). Judge Bulsara noted the same a year later. *See AM Tile Specialty Constr.*, 2020 WL 7034025, at *9. Still, Plaintiffs persist in submitting inadequate support for their calculations, this time after a motion for summary judgment, a bench trial, and post-trial submissions.

read the decisions listed above and resubmit a detailed accounting clearly breaking down and showing their calculations.[17]

   *a.* *Delinquent Contributions, Interest, and Liquidated Damages*

Plaintiffs' resubmission must, at a minimum, incorporate or address the following the issues:

---

[17] Plaintiffs are directed to Judge Pollak's decisions in particular for guidance as to the level of detail required in their submissions. *See, e.g.*, *Trs. of Local 7 Tile Indus. Welfare Fund v. Tuckahoe Tile, Inc.*, No. 15-CV-5535 (RJD) (CLP), 2016 WL 8711716, at *5-10 (E.D.N.Y. Sept. 2, 2016); *EAQ Constr. Corp.*, 2016 WL 4540306, at *6-11. In short, there should be no head-scratching, no second-guessing, and no confusion on the next turn.

1) Plaintiffs must remove delinquencies from non-fringe benefit, non-Plaintiff funds including Bricklayers and Allied Craftworkers PAC; International Dues; Vacation; Local PAC; Defense Fund; Building Fund; and Local Dues 1 and 2. *See AM Tile Specialty Constr.*, 2020 WL 7034025, at *7 (collecting cases); *Tuckahoe Tile, Inc.*, 2016 WL 8711716, at *5 n.8; R&R at 16-20, *EAQ Constr. Corp.*, No. 14-CV-4097 (Dkt. 26); *Alp Stone, Inc.*, 2015 WL 4094615, at *4-5 (citing *Flynn v. Anthony Mion & Son, Inc.*, 112 F. App'x 101, 102 (2d Cir. 2004)). Plaintiffs must also remove subcontractor damages based on Cathedral's 1099s. *See Caesar Max Const. Inc.*, 2019 WL 1130727, at *9; *EAQ Constr. Corp.*, 2016 WL 4540306, at *9-10 ("[T]here is no provision of the CBA which authorizes plaintiffs to seek contributions from the employer for the hours worked by subcontractors.").[18]

2) For the Second Castle Audit from 2016 to 2017, Plaintiffs must provide a breakdown of the total amounts due and explain which contribution categories make up that total amount. If that total amount includes categories of non-Plaintiff funds, then Plaintiffs must reduce the amounts. In short, the Second Castle Audit, as submitted, may satisfy a principal delinquency figure, but it is woefully inadequate to calculate accompanying interest or damages. Plaintiffs must fully explain their damages calculation for this period.

---

[18] Plaintiffs may offer evidence to argue that they can collect on these non-Plaintiff fund delinquencies or on these subcontractor-related delinquencies. Should Plaintiffs make this argument, however, they should include these calculations separately and apply a 9% interest rate. *See All Flooring*

3) "The Trustees have attempted to collect compound interest based on this agreement before other Courts in this District; in each case, simple interest was recommended and awarded." *AM Tile Specialty Constr.*, 2020 WL 7034025, at *10 n.5 (collecting cases). So too here. Plaintiffs must use a simple interest formula to calculate all interest damages.

4) Neither the Marble CBA nor the Marble Funds Collection Policy provide for a 15% interest rate. (*See* Marble CBA, Article XX(6); Pls.' Ex. 24, Marble Funds Collection Policy.) Thus, Plaintiffs must remove the 15% interest rate from all international Marble Fund delinquencies and apply only the 10% interest rate.

5) Plaintiffs must apply the same liquidated damages calculation to the Marble Fund delinquency as they did to the Tile Fund delinquency. Plaintiffs must further explain that calculation. *See, e.g.*, *Larsen Marble & Tile, LLC*, 2018 WL 6363923, at *5 n.3.

6) Plaintiffs must state and explain the requisite "due date" on which interest begins to accrue. *See AM Tile Specialty Constr.*, 2020 WL 7034025, at *10-11.

Plaintiffs should not rely on the preceding list as their exclusive list of errors. Rather, Plaintiffs must review the decisions listed above and resubmit their request for damages in accordance with this list and those decisions. In permitting this second chance, the court reiterates for a final time what Judge Reyes warned seven

---

*Sols., LLC*, 2020 WL 9814088, at *10; *Caesar Max Const. Inc.*, 2019 WL 1130727, at *10. In other words, Plaintiffs should provide a final calculation both inclusive and exclusive of the non-Plaintiff fund delinquencies and subcontractor-related delinquencies.

years ago: "In the future, if incorrect calculations are submitted to this Court, this Court will not re-calculate and reconstruct damages based on what evidence is presented, but instead disallow recovery as a whole." *Alp Stone, Inc.*, 2015 WL 4094615, at *6.

   *b. Attorneys' Fees and Costs & Audit Costs*

Decision on Plaintiffs' motion for attorneys' fees and costs and audit costs are reserved. The court will decide these motions following the revised calculation. No additional fees or costs should be added based on the revised calculations. Specific to the Marble delinquency, Plaintiffs should explain the significance of the clause stating that "attorneys' fees at 25% of the contribution delinquency." (Pls.' Ex. 24, Marble Funds Collection Policy at 2; *see also* Marble CBA, Article XX(6).) Plaintiffs should further address their frequently made errors in this and other courts in this District, and why these errors should, or should not, bear on the court's discretion in determining reasonable attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("The court necessarily has discretion in making this equitable judgment."). So too for audit costs. *Alp Stone*, 2015 WL 4094615, at *8 ("Requests for audit fees are generally determined by utilizing the same standards the court applies in awarding attorneys' fees.").

## III. CONCLUSION

For the reasons explained above, based on the evidence adduced at the bench trial on July 13, 2021, the court concludes the following:

- Castle is delinquent in its contributions to the Plaintiff Funds;

- Castle and Cathedral constitute a single employer and single employee bargaining unit;

- Castle and Cathedral are alter egos of one another; because of Defendants' single employer/alter ego status, Cathedral is bound to the Castle-signed CBAs;

- Because Cathedral is bound to the CBAs, Cathedral is obligated to remit contributions to Plaintiffs for each hour of Cathedral-employees' "Covered Work" pursuant to the CBAs;

- Because of their single employer/alter ego status, Defendants are jointly and severally liable for Castle's and Cathedral's delinquent contributions, plus accompanying damages provided under the CBAs, enforceable through Section 301 of the LMRA, 29 U.S.C. § 185, and Sections 502(g)(2) and 515 of ERISA, 29 U.S.C. §§ 1132(g)(2), 1145.

Decision on damages, attorneys' fees and costs, and auditor costs is RESERVED for additional briefing. Plaintiffs are DIRECTED to file a renewed damages calculation in accordance with this opinion, as well as their request for attorneys' fees and costs and audit

costs by Friday, July 8, 2022. Defendants, if they wish, are DI-
RECTED to provide Plaintiffs with additional information to
permit a more accurate damages calculation. Should Defendants
decide to provide such information, they are DIRECTED to notify
Plaintiffs and this court of their intent to do so Friday, June 17,
2022. The procedures set out in Federal Rule of Civil Procedure
52 otherwise apply with respect to all other findings and conclu-
sions in this decision.


SO ORDERED.


Dated:      Brooklyn, New York
            June 8, 2022

                                        s/Nicholas G. Garaufis        .
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge